CCC:JAM/MEM
F.#2018R00082

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -                      Docket No. 20-CR-305 (S-1) (LDH)

KARL JORDAN, JR.,
        also known as "Little D"
        and "Noid," and
RONALD WASHINGTON,
        also known as "Tinard,"

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN OPPOSITION
## TO THE DEFENDANTS' MOTIONS TO DISMISS AND SEVER

                            BREON PEACE
                            United States Attorney
                            Eastern District of New York

Artie McConnell
Mark Misorek
Assistant U.S. Attorneys
        (Of Counsel)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND ....................................................................................... 2

    I.      The Offense Conduct ...................................................................................... 2

          A.     The Narcotics Conspiracy ................................................................... 2

          B.     The October 30, 2022 Murder of Mizell ............................................ 2

          C.     Jordan's Continued Narcotics Trafficking and Firearm Usage ................. 3

          D.     Defendant Washington's 2008 Convictions and Sentencing ...................... 4

          E.     Defendant Washington's Statements About Mizell's Murder .................... 4

    II.     Indictments and Charges ................................................................................ 5

ARGUMENT ............................................................................................................. 6

    I.      The Defendants' Motions to Dismiss Based on Purported Pre-Indictment
          Delay are Without Merit ................................................................................ 6

          A.     Applicable Law ................................................................................... 6

          B.     Argument ............................................................................................ 8

               1.     Neither Defendant Has Suffered Actual Prejudice ......................... 8

               2.     The Government Did Not Intentionally Cause Delay to
                    Gain a Tactical Advantage ........................................................... 11

    II.     The Offenses and Defendants are Properly Joined and Both Severance
          Motions are Meritless ................................................................................. 15

           A.     Applicable Law ................................................................................. 16

               1.     Joinder and Severance ................................................................. 16

               2.     *Bruton v. United States* and the Confrontation Clause ................ 20

          B.     Discussion ........................................................................................ 20

               1.     Joinder Under Rule 8(b) Is Proper and Defendant Jordan
                    Will Not Suffer Any Prejudice Warranting Severance ................ 20

a.     Counts One and Two are Properly Joined with the Remaining Counts............................................................ 20

b.     No "Substantial Prejudice" Will Result From Joinder............................................................................ 24

c.     Severance Would Be Inefficient and Unfair .................... 25

2.     The Government Will Fully Comply with *Bruton*........................ 26

CONCLUSION.................................................................................................... 27

## TABLE OF AUTHORITIES

### Federal Cases

Bruton v. United States,
    391 U.S. 123 (1968) .................................................................................... 1, 19, 25

In re Terrorist Bombings of U.S. Embassies in E. Africa,
    552 F.3d 93 (2d Cir. 2008) ............................................................................ 18, 19

Richardson v. Marsh,
    481 U.S. 200 (1987) .................................................................................. 16, 20, 25

United States v. Alexander,
    135 F.3d 470 (7th Cir. 1998) ................................................................................ 22

United States v. Amato,
    15 F.3d 230 (2d Cir. 1994) ................................................................................... 18

United States v. Annamalai,
    939 F.3d 1216 (11th Cir. 2019) ........................................................................... 23

United States v. Attanasio,
    870 F.2d 809 (2d Cir. 1989) ................................................................................. 21

United States v. Baroum,
    763 F.3d 1321 (11th Cir. 2014) ........................................................................... 22

United States v. Benitez,
    920 F.2d 1080 (2d Cir.1990) ................................................................................ 26

United States v. Berg,
    714 F.3d 490 (7th Cir. 2013) ................................................................................ 22

United States v. Birney,
    686 F.2d 102 (2d Cir. 1982) ............................................................................... 7, 9

United States v. Carbonaro,
    Cr. No. 02-743 (RCC), 2004 WL 2222145 (S.D.N.Y. Sept. 30, 2004).................. 12

United States v. Cardascia,
    951 F.2d 474 (2d Cir. 1991) ............................................................................ 18, 25

United States v. Castellano,
    610 F. Supp. 1359 (S.D.N.Y. 1985) ................................................................ 8, 9, 10

United States v. Cervone,
    907 F.2d 332 (2d Cir. 1990) ................................................................. 23

United States v. Coonan,
    938 F.2d 1553 (2d Cir. 1991) ............................................................... 22

United States v. Cornielle,
    171 F.3d 748 (2d. Cir. 1999) .................................................................. 7

United States v. DeVillio,
    983 F.2d 1185 (2d Cir. 1993) ........................................................... 18, 26

United States v. Ewell,
    383 U.S. 116 (1966).......................................................................... 6, 13

United States v. Feyrer,
    333 F.3d 110 (2d Cir. 2003) ............................................................ 17, 19

United States v. Gambino,
    729 F. Supp. 954 (S.D.N.Y. 1990) ....................................................... 20

United States v. Geddes,
    844 F.3d 983 (8th Cir. 2017) ............................................................... 23

United States v. Gonzalez,
    110 F.3d 936 (2d Cir. 1997) ................................................................ 22

United States v. Gooch,
    665 F.3d 1318 (D.C.Cir.2012) ............................................................. 22

United States v. Gotti,
    Cr. No. 02-743 (RCC), 2004 WL 32858 (S.D.N.Y. Jan. 6, 2004) ...................... 9, 11

United States v. Jass,
    569 F.3d 47 (2d Cir. 2009) .................................................................. 20

United States v. Jimenez,
    824 F. Supp. 351 (S.D.N.Y. 1993) .................................................... 18, 25

United States v. Khmelnitski,
    No. 10-CR-459, 2012 WL 482022 (E.D.N.Y. Feb. 14, 2012)............................ 19

United States v. Kyles,
    40 F.3d 519 (2d Cir.1994) ................................................................... 26

United States v. Lanza,
    790 F.2d 1015 (2d Cir. 1986) .......................................................... 18, 25

United States v. Lawson,
    683 F.2d 688 (2d Cir. 1982) ................................................................ 11

United States v. Lee,
    549 F.3d 84 (2d Cir. 2008) ................................................................. 23

United States v. Lotsch,
    102 F.2d 35 (2d Cir. 1939) ................................................................. 24

United States v. Lovasco,
    431 U.S. 780 (1977) ................................................................... passim

United States v. Marion,
    404 U.S. 307 (1971) ..................................................................... 6, 7

United States v. Miller,
    116 F.3d 641 (2d Cir. 1997) ............................................................... 24

United States v. Monteiro,
    871 F.3d 99 (1st Cir. 2017) ................................................................ 23

United States v. Nerlinger,
    862 F.2d 967 (2d Cir. 1988) ........................................................... 17, 20

United States v. Page,
    657 F.3d 126 (2d Cir. 2011) ........................................................... 17, 18

United States v. Ramos,
    346 F. Supp. 2d 567 (S.D.N.Y. 2004) ..................................................... 19

United States v. Rittweger,
    524 F.3d 171 (2d Cir. 2008) .................................................. 16, 17, 21, 22

United States v. Rivera,
    09 CR 619, 2011 WL 1429125 (E.D.N.Y. Apr. 13, 2011) ...................................... 24

United States v. Ruiz,
    894 F.2d 501 (2d Cir. 1990) ............................................................... 23

United States v. Scala,
    388 F. Supp. 2d 396 (S.D.N.Y. 2005) ................................................ 7, 11, 12

United States v. Scarpa,
    Cr. Nos. 99-1312, 99-1366, 2001 WL 194350 (2d Cir. 2001) ............................... 8, 15

United States v. Shellef,
    507 F.3d 82 (2d Cir. 2007) ............................................................ 17, 27

United States v. Silberstein,
Cr. No. 02-800 (SWK), 2003 WL 21488024 (S.D.N.Y. June 27, 2003)................................. 12

United States v. Spinelli,
352 F.3d 48 (2d Cir. 2003) ........................................................................... 17, 24

United States v. Stirling,
571 F.2d 708 (2d Cir. 1978) ................................................................................ 19

United States v. Synder,
668 F.2d 686 (2d Cir. 1982) ......................................................................... 11, 14

United States v. Towne,
870 F.2d 880 (2d. Cir. 1989) ............................................................................... 22

United States v. Turoff,
853 F.2d 1037 (2d Cir. 1988) ....................................................................... 16, 19

United States v. Tutino,
883 F.2d 1125 (2d Cir. 1989) ................................................................ 16, 20, 26

United States v. Uccio,
917 F.2d 80 (2d Cir. 1990) .................................................................................. 20

United States v. Ventura,
724 F.2d 305 (2d Cir. 1983) ......................................................................... 17, 18

United States v. Werner,
620 F.2d 922 (2d Cir. 1980) ............................................................................... 24

United States v. Williams,
936 F.2d 698 (2d Cir. 1991) ............................................................................... 26

United States v. Yousef,
327 F.3d 56 (2d Cir. 2003) .......................................................................... 19, 26

Zafiro v. United States,
506 U.S. 534 (1993).................................................................................... passim

## Federal Rules

Fed. R. Crim. P. 8(b)........................................................................................... 16

Fed. R. Crim. P. 14(a) ................................................................................... 17, 18

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to defendant Ronald Washington's motion to dismiss the Superseding Indictment, ECF Docket Nos. 81, 82 ("Washington Memorandum") and defendant Karl Jordan, Jr.'s motions to dismiss Counts One and Two of Superseding Indictment; to sever Counts One and Two from the remaining counts, Counts Three through Eleven; and to sever the defendants for trial, ECF Docket Nos. 83, 84 ("Jordan Memorandum"). Both defendants are charged with the narcotics-related murder of Jason Mizell, also known as "Jam Master Jay," as alleged in Counts One and Two of the Superseding Indictment. Defendant Jordan is also charged with additional narcotics offenses, as alleged in Counts Three through Eleven.

The defendants' respective motions to dismiss are predicated on the same general theory: that the government intentionally caused an extensive pre-indictment delay that has resulted in actual prejudice to the defendants. These motions are baseless, rely on inaccurate factual allegations, and are entirely unsupported by relevant precedent. Defendant Jordan also seeks severance of Counts Three through Eleven due to purported "spillover prejudice" and misjoinder. In addition, Jordan seeks severance from defendant Washington under Bruton v. United States, 391 U.S. 123 (1968), on account of Washington's statement to the media implicating Jordan in Mizell's murder. Both of these motions should be denied. As explained below, Jordan's motions to sever based on prejudice and misjoinder fail, as the conduct charged in the Superseding Indictment is unified through participants, witnesses, facts and common scheme, and any purported spillover prejudice can be cured by a limiting instruction. Finally, Jordan's severance motion related to Washington's statements should be denied because the statements the government intends to introduce at trial will comply with Bruton.

1

## FACTUAL BACKGROUND[1]

I.      The Offense Conduct

A.      The Narcotics Conspiracy

In addition to his music career, in or about and between 1996 and 2002, Mizell was involved in transporting kilogram-quantities of cocaine for retail sale in the Eastern District of New York and elsewhere.  In or about July 2002, Mizell acquired approximately ten kilograms of cocaine on consignment from a supplier in the Midwest.  The cocaine was intended for distribution in Maryland by Washington, Jordan and other co-conspirators.  A dispute between Washington and one of the co-conspirators resulted in Mizell telling Washington that he would be cut out of the Maryland transaction.  Following Washington's dispute with Mizell, Washington and Jordan conspired to murder Mizell.

B.      The October 30, 2022 Murder of Mizell

On Wednesday, October 30, 2002, Mizell and several others were present at his recording studio, 24/7 Studio, located on Merrick Boulevard in Queens, New York.    At approximately 7:30 p.m., Washington and Jordan, armed with firearms, entered the studio.  Each brandished a firearm.  Washington pointed his firearm at one of the individuals located inside the studio and demanded that the person lay on the floor.  Jordan approached Mizell, pointed his firearm at him, and fired two shots at close range.  One of those shots struck Mizell in the head, killing him.  The second shot struck another individual in the leg.

---

[1]      In their respective motions, both Washington and Jordan rely on selective and misleading characterizations of the record.  Accordingly, unless expressly consented to herein, the government denies the factual allegations in the defendants' respective motions.

C.    Jordan's Continued Narcotics Trafficking and Firearm Usage

Subsequent to Mizell's murder, Jordan's involvement in the narcotics trade and firearms offenses continued until his arrest in 2020.  Jordan would typically sell cocaine and cocaine base to a variety of different buyers on a weekly basis.  He would often be in possession of a firearm while doing so – one witness described the type and color of a firearm that Jordan kept in either the driver's side door pocket or the center console of his vehicle while engaging in narcotics transactions.  Another witness described how one of Jordan's young children would be in the car when he would deliver narcotics.

Jordan's drug trafficking and firearms usage during this period was punctuated by several arrests, none of which resulted in a criminal conviction:

- On February 3, 2003, Jordan was arguing with an individual on 203rd Street in Queens.  Jordan produced a semi-automatic pistol and fired one shot into the air.  Responding police officers recovered the spent shell casing and an additional 83 live rounds. Though Jordan was initially charged with a felony firearm offense, the eyewitness refused to cooperate and testify, and the grand jury only indicted Jordan for possession of ammunition, a misdemeanor.  Jordan eventually pled guilty to a disorderly conduct violation.

- On May 14, 2003, Jordan fired several shots at an individual on Hollis Avenue in Queens, striking him once in the leg.  Jordan was arrested for Criminal Use of a Firearm in the First Degree, but the case was subsequently dismissed when the victim refused to cooperate with law enforcement.

- On November 1, 2004, Jordan was involved in a shootout with another individual on Farmers Boulevard in Queens.  Rounds from the exchange went through windows and walls of the surrounding houses, cars and a nearby church.  Over 27 pieces of ballistic evidence – including shell casings and spent projectiles – were recovered by responding officers.  The defendant fled the scene in a gold BMW and was later arrested.  The case was ultimately dismissed.

- On December 15, 2004, a search warrant was executed at Jordan's residence on 203rd Street in Queens, predicated on Jordan's narcotics sales.  During the search, law enforcement recovered a loaded 9mm semi-automatic pistol, a loaded 9mm magazine, a loaded .32 caliber revolver, and a bullet proof vest.  Also in the residence were over 150 bags of marijuana, various bags and foil

3

wraps containing cocaine, and hundreds of glassine envelopes used for packaging narcotics. Jordan and six other individuals were inside at the time and arrested, and the case resulted in a plea to disorderly conduct.

While Jordan successfully avoided arrest up until the instant case, witness testimony, information from Jordan's cell phones and other evidence obtained during the course of the investigation showed that his narcotics distribution continued unabated. Then, in and around 2017, an undercover law enforcement agent (the "UC") successfully arranged to purchase narcotics from Jordan. Jordan subsequently made seven separate narcotics sales to the UC. These transactions were recorded using both audio and video recording devices.

D.    Defendant Washington's 2008 Convictions and Sentencing

During the course of the investigation, defendant Washington was identified as having committed a string of armed robberies in the Eastern District of New York. He was arrested on June 22, 2006, pursuant to indictment 05-CR-558 (NG). Following a jury trial, on April 5, 2007, Washington was convicted on all counts, including Hobbs Act robbery conspiracy and six substantive robbery charges. On April 23, 2008, Washington was sentenced to 210 months imprisonment. During the sentencing phase of the case, the government requested that the Court consider Washington's involvement in the November 30, 1995 murder of Randy "Stretch" Walker, as well as Mizell's homicide, arguing that it could prove each by the applicable preponderance of the evidence standard. The sentencing court found the government's request "inappropriate" and declined to consider either murder as part of the sentencing analysis. Washington Sentencing Tr. at pp. 15-6.

E.    Defendant Washington's Statements About Mizell's Murder

Washington has made numerous statements—to law enforcement and others—regarding his involvement in Mizell's murder. For purposes of the instant motion, the government

4

is aware of the following statements that may implicate defendant Jordan's Confrontation Clause

rights under <u>Bruton</u> if they were to be admitted in their entirety without redaction:

- March 3, 2003: a statement to law enforcement where Washington admitted to being present during the homicide and named defendant Jordan and Jordan's father as the gunmen in Mizell's murder.

- December 2003: a statement made during an interview with <u>Playboy</u> magazine where Washington admitted to being present during the homicide and named defendant Jordan and Jordan's father as the gunmen in Mizell's murder. This statement is cited by defendant Jordan in support of his severance motion.

- April 16, 2019: a statement to law enforcement where, at one point during the interview, Washington asked the agents if "they were going to put me [Washington] and Noid [defendant Jordan] on an indictment and see who rats first." At no point during the interview had any of the interviewing agents mentioned "Noid" or defendant Jordan by any other name. At the end of the interview, after being presented with some of the evidence that had been amassed against him, Washington stated, "[s]o, you are not going to get the shooter, you're only going to get the guy standing by the door." Washington did not specify who "the shooter" was.

- Subsequent to his arrest on the instant matter, Washington made a spontaneous utterance to agents who were processing his arrest, stating that he "never wanted someone else to get in trouble for something he [Washington] had put them up to." He did not specify the identity of "someone else."

## II.    Indictments and Charges

On August 13, 2020, a grand jury in the Eastern District of New York returned an

indictment charging Jordan and Ronald Washington with one count of murder while engaged in

narcotics trafficking, in violation of Title 21, United States Code, Section 848(e)(1)(A), and one

count of firearm-related murder, in violation of Title 18, United States Code, Sections 924(j)(1),

for the October 30, 2002 murder of Mizell. Jordan was also charged with one count of conspiracy

to distribute cocaine and seven counts of cocaine distribution, in violation of Title 21, United States

Code, Sections 846 and 841(a)(1), respectively. On March 4, 2021, the grand jury returned a

superseding indictment, which charged Jordan with additional crimes, including one count of

conspiracy to distribute 280 grams or more of cocaine base, in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A)(iii) and 841(b)(1)(C), and one count of use of firearms in connection with a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i).

<u>ARGUMENT</u>

I.      <u>The Defendants' Motions to Dismiss Based on Purported Pre-Indictment Delay are Without Merit</u>

Defendants Jordan and Washington both move this Court to dismiss Counts One and Two, claiming violations of their Due Process Clause rights under the Fifth Amendment.  In the alternative, each defendant—citing no legal support or precedent—asks this Court for an evidentiary hearing on the cause of the delay between the murder and the defendants' arrest.  <u>See</u> Jordan Mem. at 4; Washington Mem. at 2.  These motions are specious.  Jordan and Washington have not—and cannot—establish that any perceived preindictment delay caused them to suffer actual and substantial prejudice.  Nor can they establish that the Government intentionally caused the delay to gain a tactical advantage.  As such, their respective motions for dismissals or hearings must be denied.[2]

A.      <u>Applicable Law</u>

It is well-settled that the statute of limitations is the "'primary guarantee against bringing overly stale criminal charges.'"  <u>United States v. Marion</u>, 404 U.S. 307, 322 (1971) <u>quoting</u> <u>United States v. Ewell</u>, 383 U.S. 116, 122 (1966).  An indictment brought within the statute

---

[2]     The defendants' complaints about pre-indictment delay ring particularly hollow when considering their efforts to intimidate and silence potential witnesses, which the government expects to show at trial.  The government is aware of at least four separate witnesses that the defendants have endeavored to identify and silence through threats and coercion.

of limitations is presumptively timely.  See United States v. Cornielle, 171 F.3d 748, 751-52 (2d. Cir. 1999) (holding that indictments brought within the applicable statute of limitations have "a strong presumption of validity" and should be "only rarely dismissed").  The Due Process Clause does not "permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment."  United States v. Lovasco, 431 U.S. 780, 790 (1977).  Rather, to show a due process violation based on pre-indictment delay, a defendant must demonstrate that (1) the delay caused actual and substantial prejudice, and (2) the government intentionally caused the delay to obtain a tactical advantage.  See Marion, 404 U.S. at 324; Cornielle, 171 F.3d at 751; see also Lovasco, 431 U.S. at 790 (to dismiss indictment based on pre-indictment delay, defendant "must establish that permitting the government to proceed…would be so unfair as to violate fundamental conceptions of justice.").

The defendant bears the "heavy burden of proving both that [she] suffered actual prejudice because of the alleged pre-indictment delay and that such delay was a course intentionally pursued by the government for an improper purpose."  United States v. Scala, 388 F. Supp. 2d 396, 399 (S.D.N.Y. 2005) quoting Carnielle, 171 F.3d at 752 (internal quotation marks omitted).  The burden of proving actual prejudice is on the defendant, and the proof of prejudice must be definite and not speculative."  United States v. Birney, 686 F.2d 102, 105-06 (2d Cir. 1982); see also Cornielle, 171 F.3d at 752 (characterizing the defendant's burden as "heavy").

The government is under no obligation to file charges as soon as probable cause exists to charge a defendant or even immediately after assembling evidence sufficient to establish a suspect's guilt beyond a reasonable doubt.  Lovasco, 431 U.S. at 791-93. "It is not improper for the government to delay an indictment for legitimate considerations, such as the need to obtain evidence and the difficulties that necessarily arise in a complex [conspiracy] investigation."

7

United States v. Scarpa, Cr. Nos. 99-1312, 99-1366, 2001 WL 194350, at *1 (2d Cir. 2001) (internal quotation and citation omitted).  Indeed, prosecution of a defendant following a period of investigative delay is permissible even "if his defense might have been somewhat prejudiced by the lapse of time."  Lovasco, 431 U.S. at 796.

B.      Argument

The defendants cannot show that they suffered actual prejudice or that the government intentionally caused any delay to gain an actual advantage.  Instead, their dismissal motions seem designed to invite the government to proffer facts regarding the government's investigation and trial strategy.  The government rejects this invitation, and the Court should deny their motions.

1.      Neither Defendant Has Suffered Actual Prejudice

At the outset, each defendant's respective claims necessarily fail because they cannot satisfy the threshold requirement of demonstrating actual prejudice. "Actual prejudice is a fairly stringent standard.  The passage of time, and the attendant loss of evidence and dimming of witnesses' memories, is insufficient by itself to show prejudice."  United States v. Castellano, 610 F. Supp. 1359, 1385 (S.D.N.Y. 1985) (internal quotations omitted).  Even "the death or absence of potential witnesses or the loss of documentary evidence sufficient to establish actual prejudice." Id (citing cases and noting that courts have "refused to infer prejudice from delays of five [to] nineteen-and-a-half years.").

Here, Jordan contends that he was prejudiced for three reasons.  See Jordan Mem. 6.  First, in a single sentence, Jordan flatly asserts that he was prejudiced because he no longer has access to "cell phone records . . . telephone [records] and beeper records" all of which could help support his alibi.  Id.  Second, Jordan claims that the Brady materials supplied by the government

8

to the defense are "stale."  Id.  Finally, Jordan claims he has been unable to interview "an eyewitness to the shooting despite numerous attempts to locate him."  Id.  In even more conclusory fashion, Washington claims that he has been prejudiced due to being deprived of "objective evidence and witnesses" and the "fading and contaminated memor[ies]" of witnesses over the years.  Washington Mem. 3-6.  Neither Jordan nor Washington's speculative claims, even if accepted as true, support a finding of actual prejudice.  See Birney, 686 F.2d at 105-06.

First, Jordan states that various electronic records he may have been able to obtain in 2002 would yield evidence supporting his claim of an alibi at the time of the murder.  This argument fails.  If anything, the government has been prejudiced by the lack of available phone records.  Jordan's argument ignores the fact that he has been identified and indicted as Mizell's shooter, facts that the grand jury has credited in finding sufficient evidence to return a true bill on two occasions.  In addition, as described above, his co-defendant—while admittedly trying to exculpate himself in the process—has repeatedly implicated Jordan in Mizell's killing.  Jordan's argument also ignores the fact that Jordan, as evinced by the two cellular phones that were recovered from him on the date of his arrest, is savvy when it comes to concealing and compartmentalizing his criminal undertakings.  Specifically, Jordan used two phones, one for personal use and the other for narcotics trafficking.  As such, it is far more likely that Jordan would have purposefully left his phone elsewhere when he shot Mizell.  In sum, Jordan's argument that he has been deprived of electronic records is speculative, far from what is required under the law, and ultimately without merit.  See United States v. Gotti, Cr. No. 02-743 (RCC), 2004 WL 32858, at *12 (S.D.N.Y. Jan. 6, 2004) (holding that "speculation [of prejudice], utterly devoid of a factual or legal basis, cannot satisfy [a defendant's] 'heavy burden.'") (internal citation omitted).

9

Second, Jordan contends that the passage of time renders all Brady disclosures made by the government "stale," which Jordan then concludes constitutes prejudice. Jordan Mem. p. 6. Here, Jordan's framing of the issue is self-serving, and he does not provide even one example of such "stale" Brady material or why his use of such material has been impeded. As the Court is aware, the government has made numerous disclosures beyond what Brady or Rule 16 require, and both defendants, who are represented by several capable, experienced lawyers, are equipped to investigate and use this material at trial. Certainly, the conclusory and theoretical issues they cite are common to any "cold case" that is later charged.

Third, Jordan claims he has been prejudiced because he has been unable to interview a witness to the murder after making "numerous attempts" to do so. Jordan Mem. p. 6. Jordan's inability to locate a witness—even assuming said witness was willing to be interviewed— is insufficient to meet his heavy burden of demonstrating prejudice. At present, the government is aware that the witness is alive and resides in the United States. Regardless, even if the witness was truly unavailable, including if they were deceased, this would not constitute actual prejudice. See Castellano, 610 F. Supp. at 1385 (citing cases and noting that the "the death or absence of potential witnesses [is not] sufficient to establish actual prejudice."). Certainly then, it is unwarranted to extrapolate actual prejudice here.

Washington's claims are even more vague. His general, amorphous allegation of prejudice appears to largely be predicated on witnesses' memories potentially failing due to the passage of time. To support his proposition, the defendant cites to what he believes to be inconsistent interviews that government witnesses have given at various times. However, just like in any criminal prosecution, and even assuming arguendo complete candor and good faith on the part of the witness, witnesses will undoubtedly not recall and recount events in the same manner

10

on every occasion.  Far from constituting actual prejudice, this creates fertile ground for the defendants to cross examine the witnesses on any perceived inconsistencies.  Certainly, this issue is no more acute in this case than it is in any complex, long-term investigation.  Thus, Washington's motion should be denied, as his claims are not particularized and lack merit.

Moreover, neither defendant can cite any precedent for the relief they seek under similar circumstances, and the government has found none.  Indeed, an examination of decisions from district courts in this Circuit makes plain that even the alleged prejudice here falls far short of the actual and substantial prejudice required.  For example, in Scala, an extortion case, the court held that the death of two witnesses who managed and owned a business that was extorted did not constitute actual prejudice.  388 F. Supp. 2d at 398-99; see also United States v. Synder, 668 F.2d 686, 689 (2d Cir. 1982) (holding that death of two witnesses did not establish actual prejudice).  Additionally, in Lawson, the Second Circuit held that in a robbery case, the destruction of the notes of the bank teller who was robbed did not qualify as actual prejudice.  See United States v. Lawson, 683 F.2d 688, 694 (2d Cir. 1982).  When compared to those cases, it is clear that the defendants' claims of alleged missing records, staleness of Brady materials, failure to schedule witness interviews and inconsistent witness statements is also insufficient.  See Gotti, 2004 WL 32858, at *12-13 (noting that "the Supreme Court has instructed that dimmed memories, inaccessible witnesses, and lost evidence are not enough to prove substantial prejudice").

2.    The Government Did Not Intentionally Cause Delay to Gain a Tactical Advantage

Even if the defendants were to show actual prejudice—which they cannot—they fail to meet their burden of demonstrating that the government intentionally delayed the prosecution to gain a tactical advantage.

Both Jordan and Washington each claim that the delay between Mizell's homicide and the instant prosecution was either in bad faith or reckless.  See Jordan Mem. p. 9; Washington Mem. p. 10.  They each deduce this from the fact that the government sought to have Washington's role in Mizell's murder considered as relevant conduct following his 2008 conviction for multiple Hobbs Act robberies, concluding that because the government was able to meet a preponderance standard as to Washington's role, failing to prosecute both defendants at that time exhibits recklessness or bad faith.  These arguments are entirely speculative, unsupported by the record and fall far short of the "heavy burden" needed to demonstrate that the "delay was a course intentionally pursued by the government for an improper purpose."  Scala, 388 F. Supp. 2d at 399.  As such, the Court can and should deny their motions in their entirety.  See United States v. Carbonaro, Cr. No. 02-743 (RCC), 2004 WL 2222145 (S.D.N.Y. Sept. 30, 2004) (in a racketeering conspiracy case in which a 14-year-old murder was alleged as a predicate act, even assuming the defendant had shown actual prejudice, the defendant's motion to dismiss based on pre-indictment delay failed because the defendant supplied no evidence that the government's conduct was for an improper purpose); United States v. Silberstein, Cr. No. 02-800 (SWK), 2003 WL 21488024, at *4 (S.D.N.Y. June 27, 2003) (rejecting claim of pre-indictment delay and noting that "[o]ther than citing the length of time between the onset of the defendants' actions and the time of the indictment, defendants put forth no evidence that the Government engaged in any deliberate actions to delay the indictment in this case for its own benefit).

In addition to relying entirely on representations made during the course of Washington's robbery sentencing, the defendants misstate the record in that proceeding. Specifically, both defendants overlook that the sentencing colloquy dealt almost exclusively with the 1995 murder of Randy "Stretch" Walker and not the Mizell homicide.  See Washington

Sentencing Tr. at pp.15-16 (assigned AUSA stated, ("[i]t is not just these murders and there is, in fact, one murder that we would propose proving and I submit that it would not be [a] complicated extensive hearing.  We would have direct testimony from three people establishing that he was the shooter in this murder [of Walker].").  To the extent that the government did ask the Court to consider the Mizell murder in its January 9, 2008 letter, the government explained it had "proof, above and beyond a preponderance, that [defendant Washington] committed the murder." Washington Mem., Exhibit 3 at ⁋ 3.  However, that did not mean the government believed, at that time, that it could prove Washington's guilt beyond a reasonable doubt.  Nor was the government compelled to charge Washington and Jordan shortly thereafter.  Indeed, the Supreme Court has made clear that "[i]t should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.  To impose such a duty would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself."  Lovasco, 431 U.S. at 791 (quoting Ewell, 383 U.S. at 120) (internal quotations omitted).

Moreover, the defendants fail to explain what tactical advantage the government could have possibly sought to gain by delaying the instant prosecution.  That is unsurprising because there is none.  Typically, delay in prosecution inures to the benefit of the defendant since the passage of time renders it more difficult for the government to sustain its burden of proof. Accordingly, the defendants' attempts to shift their "heavy burden" to the government is improper.

Although it is not the government's burden to carry, since the time of Washington's sentencing hearing, and within the five years prior to the instant prosecution, the government has taken substantial investigative steps.  Indeed, the government has, inter alia, identified and

interviewed multiple individuals that had not previously been interviewed; issued hundreds of grand jury subpoenas; applied for and executed numerous search warrants; conducted dozens of interviews throughout the country; obtained the cooperation of witnesses necessary to prove the defendants' guilt at trial beyond a reasonable doubt; recanvassed for physical evidence; and conducted additional ballistics and DNA testing. These and other investigative steps were necessary to develop and corroborate evidence of both Jordan's and Washington's involvement in the murder and the underlying narcotics conspiracy. See Synder, 668 F.2d at 689 (holding government did not intentionally delay to gain tactical advantage where, like here, "charges…were a part of a larger investigation, which the government required time to develop"). Indeed, the investigation into Mizell's homicide and related criminal conduct remains open and active at present.[3]

This fully comports with the Supreme Court's holding in Lovasco and its progeny. "The decision to file criminal charges, with the awesome consequences it entails, requires consideration of a wide range of factors in addition to the strength of the Government's case, in order to determine whether prosecution would be in the public interest. Prosecutors often need more information than proof of a suspect's guilt, therefore, before deciding whether to seek an indictment." Lovasco, 431 U.S. at 761-62. This is axiomatic, and Lovasco rightly recognizes that "investigative delay" is "fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused." 431 U.S. at 795-96 (internal quotations omitted). The Court noted that it does not offend "fundamental conceptions of justice" for a prosecutor to defer an

---

[3]     The defendants' unsupported claim of government malfeasance is also wholly inconsistent with the government's conduct during the prosecution of the case. Indeed, the government has provided the defense with numerous disclosures that go well beyond its obligations under Rule 16 or Brady. Additionally, the government has also offered to hold "reverse proffer" sessions with each defendant and outline the evidence against them, far in advance of trial.

indictment even after he has evidence sufficient to show probable cause or even guilt beyond a reasonable doubt, and the Court stressed that the determination by prosecutors to bring criminal charges properly includes consideration of not only the strength of the evidence but also other factors.  Id. at 793-96 ("[r]ather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictment until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt."); see also Scarpa, 2001 WL 194350, at *1.  Such is the case here.

*     *     *

In sum, based on Lovasco and its progeny, the government may properly delay an indictment for legitimate considerations, including the need to gather and review evidence in a complex investigation.  That is what occurred here, and the interval between the offense and the indictment was necessary for the government to prove the charged crimes beyond a reasonable doubt.  The defendants have not shown prejudice or ill intent beyond thin, anecdotal, and conclusory allegations, and their motions to dismiss should be denied without a hearing.

II.   The Offenses and Defendants are Properly Joined and Both Severance Motions are Meritless

Defendant Jordan's severance motions effectively ask this Court to conduct three separate trials.  First, Jordan moves to sever Counts One and Two from Counts Three through Eleven, splitting the narcotics-related murder charge from Jordan's other narcotics trafficking activity.  Second, Jordan then moves to have a separate trial on Counts One and Two, ostensibly based on a statement Washington made to the media implicating Jordan in Mizell's murder.  Both of these motions should be denied.

Regarding his motion to sever Counts One and Two from the remaining nine counts, defendant Jordan's arguments are contrary to the law applicable to joinder and severance

15

and ignore that highly similar narcotics trafficking and firearms-related activity permeate all the charges in the case. Additional prophylactic limiting instructions and the Court's jury charge will sufficiently mitigate Jordan's purported concerns. Zafiro v. United States, 506 U.S. 534, 537-39 (1993). Severance of counts is therefore unwarranted.

Considering his motion to sever his trial from defendant Washington, to the extent the government intends to use any statement from either defendant, the government will comply with the requirements of Bruton and either omit or redact any reference to the co-defendants that connect them to Mizell's murder. As this is sufficient to protect both defendants' confrontation rights, Jordan's motion to sever on this basis should be denied. See Richardson v. Marsh, 481 U.S. 200, 211 (1987); United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989).

A.    Applicable Law

1.    Joinder and Severance

Rule 8(a) of the Federal Rules of Criminal Procedure governs the joinder of offenses, whereas Rule 8(b) governs the joinder of defendants. Where, as here, the joinder involves both multiple offenses and multiple defendants, Rule 8(b) must be applied. United States v. Turoff, 853 F.2d 1037, 1043 (2d Cir. 1988). Rule 8(b) provides that two or more defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Second Circuit has "interpreted the 'same series of acts or transactions' language of Rule 8(b) to mean that joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008) (some internal quotation marks omitted). In this context, courts "apply a commonsense rule to decide whether, in light of

16

the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to either or both of the defendants resulting from the joinder." United States v. Shellef, 507 F.3d 82, 98 (2d Cir. 2007) (internal quotation marks omitted). Rule 8(b) is satisfied by either a "substantial identity of facts or participants" or "a common plan or scheme"; it does not require both. Rittweger, 524 F.3d at 177. "Under this rule [8(b)], 'a non-frivolous conspiracy charge' is generally sufficient to support joinder." 2017 Severance Order (ECF No. 593) at 5 (quoting United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988)).

If joinder is proper, a defendant may move pursuant to Federal Rule of Criminal Procedure 14(a) for severance where a joint trial would prejudice a defendant. Id. (citing Fed. R. Crim. P. 14(a); United States v. Spinelli, 352 F.3d 48, 54 (2d Cir. 2003)). "Given the 'preference in the federal system for joint trials of defendants who are indicted together,' a severance should be granted only where 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" Id. at 5-6 (quoting Zafiro, 506 U.S. at 537-39 and citing United States v. Ventura, 724 F.2d 305, 312 (2d Cir. 1983) ("We have held repeatedly that, absent a showing of substantial prejudice, defendants who are jointly indicted should be jointly tried.")); United States v. Page, 657 F.3d 126, 129 (2d Cir. 2011) ("[T]he defendant [must] demonstrate[] that the failure to sever [would] cause[] him substantial prejudice in the form of a miscarriage of justice.")). "In addition, even where a defendant shows a risk of prejudice, 'less drastic measures' than severance, 'such as limiting instructions, often will suffice to cure any risk of prejudice.'" Id. at 6 (quoting Zafiro, 506 U.S. at 539); see also United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003) (upholding joinder of co-defendants although neither party was charged in the cospiracy counts of the other,

17

noting that even where the risk of prejudice is high, "less drastic measures—such as limiting instructions—often suffice as an alternative to granting a Rule 14 severance motion").

A properly joined defendant seeking severance thus carries a heavy burden of showing that joinder will result in "substantial prejudice" to his right to a fair trial. United States v. Amato, 15 F.3d 230, 237 (2d Cir. 1994) (internal quotation marks omitted); see also United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991) ("The defendant must establish prejudice so great as to deny him a fair trial."); Ventura, 724 F.2d at 312 ("We have held repeatedly that, absent a showing of substantial prejudice, defendants who are jointly indicted should be jointly tried."). In addition, a defendant seeking severance must show that "the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." United States v. Lanza, 790 F.2d 1015, 1019 (2d Cir. 1986) (internal quotation marks omitted). Such a showing is difficult to make because the "risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits." United States v. Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993).

The decision to grant or deny a severance motion is committed to the sound discretion of the trial judge and will not be disturbed on appeal absent a showing by the defendant that "the failure to sever caused him substantial prejudice in the form of a miscarriage of justice." Page, 657 F.3d at 129 (internal quotation and citations omitted); see also In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 131 (2d Cir. 2008) ("[A] district court order denying a Rule 14 motion . . . will be overturned only if a defendant can show prejudice so severe that his conviction constituted a miscarriage of justice and that the denial of his motion constituted an abuse of discretion.") (internal quotation and citations omitted); United States v. DeVillio, 983

18

F.2d 1185, 1192-93 (2d Cir. 1993) ("[A] defendant must establish more than that he would have a better chance of obtaining an acquittal at a separate trial.  In fact, [to show sufficient prejudice on appeal] an appellant must show that a 'miscarriage of justice' has occurred." (internal quotation marks and citations omitted)); United States v. Stirling, 571 F.2d 708, 733 (2d Cir. 1978) (absent misjoinder, a severance motion is committed to the discretion of the trial court and is "virtually unreviewable" (quoting 8 James Wm. Moore et al., Moore's Federal Practice ¶ 14.02(1), at 14-3 (2d ed. 1977))).

It is well settled that there is a "preference in the federal system for joint trials of defendants who are indicted together."  In re Terrorist Bombings, 552 F.3d at 131 (quoting Zafiro, 506 U.S. at 537); United States v. Yousef, 327 F.3d 56, 149 (2d Cir. 2003).  Joint trials "promote efficiency" and "serve the interests of justice" by, inter alia, avoiding inconsistent verdicts, not requiring the same witnesses to testify repeatedly, preserving judicial resources and avoiding delays.  Zafiro, 506 U.S. at 537; see also Bruton, 391 U.S. at 134 (finding that joint trials conserve government resources, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crimes to trial); Feyrer, 333 F.3d at 114 (holding that for reasons of economy, convenience and avoiding delay, there is a preference for joint trials).  Where, as here, joinder in a single indictment pursuant to Rule 8 is proper, there is a strong presumption that the defendants should be tried together.  See United States v. Ramos, 346 F. Supp. 2d 567, 569 (S.D.N.Y. 2004) (citations omitted).  The presumption under Rule 8 is even stronger when "the crime charged involves a common scheme or plan."  Ramos, 346 F. Supp. 2d at 569; accord Turoff, 853 F.2d at 1042-43.  Indeed, district courts have repeatedly observed that "co-conspirators should be tried together whenever feasible."  United States v. Khmelnitski, No. 10-CR-459, 2012

WL 482022, at *2 (E.D.N.Y. Feb. 14, 2012) (quoting United States v. Gambino, 729 F. Supp. 954, 970 (S.D.N.Y. 1990)).

2. *Bruton v. United States* and the Confrontation Clause

As the Supreme Court has recognized, there is no violation of a defendant's confrontation rights if a co-defendant's statement or confession is redacted to omit all reference to the defendant. See Richardson, 481 U.S. at 211. Indeed, the Second Circuit has repeatedly held that the redaction or removal of a defendant's reference to co-defendants is sufficient to be admitted without violating a co-defendant's Bruton rights. As the Second Circuit has held, "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes" does not violate Bruton. Tutino, 883 F.2d at 1135; see also United States v. Jass, 569 F.3d 47, 58 (2d Cir. 2009).

B. Discussion

1. Joinder Under Rule 8(b) Is Proper and Defendant Jordan Will Not Suffer Any Prejudice Warranting Severance

a. Counts One and Two are Properly Joined with the Remaining Counts

Joinder under Rule 8(b) is wholly appropriate in this case. The Superseding Indictment unambiguously alleges that the defendants conspired to commit, and actually committed, the narcotics-related murder of Mizell. "A non-frivolous conspiracy charge is sufficient to support joinder of defendants." Nerlinger, 862 F.2d at 967; see also United States v. Uccio, 917 F.2d 80, 87 (2d Cir. 1990) (where jury convicted defendants of single conspiracy, joinder was proper). "Under the plain language of Rule 8(b), the decision to join parties turns on what is 'alleged' in the 'indictment.'" Id.

20

While Jordan complains that the additional charged narcotics activity is temporally distinct and unrelated to Mizell's homicide, this is an insufficient basis to grant severance, as all the counts in the Superseding Indictment are "unified by some substantial identity of facts or participants," and "arise out of a common plan or scheme," Rittweger, 524 F.3d at 177, making a joint trial appropriate.  To be sure, all of the crimes charged in the indictment are infused with narcotics activity and firearms usage in furtherance of that activity.  Beyond this, it is notable that Jordan's involvement in the narcotics conspiracy that led to Mizell's murder involved his distribution of retail quantities of cocaine—the exact same conduct at issue in Counts Three through Eleven.  Additionally, some of the evidence relating to Jordan's involvement in Mizell's homicide includes Jordan's narcotics trafficking, firearms use and statements after October 30, 2002.  The government also expects significant overlap of witness as a result.  Indeed, many of the witnesses, including Jordan's co-conspirators, as well as individuals who purchased narcotics from Jordan, knew and were involved with Jordan well before 2015.  Severance would require these witnesses to testify twice to the same events and conduct.

Thus, all of the counts in the indictment involve 1) Jordan's trafficking retail quantities of cocaine, evincing similar methods and means of criminal conduct; 2) Jordan's possession and use of semi-automatic firearms; and 3) overlapping witnesses, including co-conspirators and victims.  Accordingly, not only should the charges be tried together, see Rittweger, 524 F.3d at 178 (upholding joinder of defendants involved in separate conspiracies even where, unlike here, the connection between the two charged conspiracies was "tenuous"); United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (upholding joinder of defendants involved in separate conspiracies on the grounds that the conspiracies shared a common purpose and there was "an overlap of participants and acts"), but much of the evidence will be admissible even if

21

severance were granted, to "complete the story of the crime[s] on trial." United States v. Gonzalez, 110 F.3d 936, 941-42 (2d Cir. 1997).[4] See, e.g., Gonzalez, 110 F.3d at 941-42 ("It is well established that 'evidence of uncharged criminal activity is not considered "other crimes" evidence under Rule 404(b) if it "arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'") (quoting United States v. Towne, 870 F.2d 880, 886 (2d. Cir. 1989) (alteration in original)).

As such, Jordan cannot credibly argue that the counts in the Superseding Indictment do not "share a substantial identity of facts or participants." Rittweger, 524 F.3d at 177-179. While there is admittedly a substantial gap in time between the allegations of Counts One and Two and the remaining counts, Jordan's narcotics and firearms-related conduct during this period was constant and comparable: he sold retail quantities of cocaine and carried, brandished and used firearms in furtherance thereof.[5] Indeed, this temporal break inures to Jordan's benefit, in that it

---

[4] The government is also permitted to elicit other acts evidence from a witness insofar as those acts constitute impeachment material that the witness may be cross-examined about by the defense. See, e.g., United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("[S]ince the witnesses were participants in the events about which they testified, it was appropriate for the prosecution to elicit testimony during direct examination that exposed details damaging to their credibility. In this manner, the prosecution was able to avoid the appearance that it was concealing impeachment evidence from the jury.").

[5] While Rule 8(a) does not apply in the instant circumstances, caselaw on joinder of offenses is instructive here. Rule 8(a) does not require that joined offenses be "temporally or evidentially related"; all it requires is that they be "of like class." United States v. Alexander, 135 F.3d at 476 (7th Cir. 1998); see also United States v. Gooch, 665 F.3d 1318, 1335 (D.C.Cir.2012) ("Rule 8(a) permits the joinder of offenses of the same or similar character, even if they are entirely unrelated to each other" as a factual matter) (internal quotation marks omitted). Here, the fact that both crimes involved drug dealing suffices to make them of like class. United States v. Baroum, 763 F.3d 1321 (11th Cir. 2014), certiorari denied, 575 U.S. 978 (joinder of various narcotics counts joinable as they were similar in character, even though some events took place earlier in time and at a different locations). United States v. Berg, 714 F.3d 490 (7th Cir. 2013) ("two sets of offenses—three of which related to marijuana trafficking and

makes jury confusion less likely, particularly when the Court gives an appropriate limiting instruction and jury charge.  Regardless, Jordan cites no case—and the government has found none—where severance has been granted in similar circumstances.

Jordan also ignores the myriad of cases in this and other districts where far more attenuated conduct has been found to be properly joined.  See, e.g., United States v. Cervone, 907 F.2d 332, 341 (2d Cir. 1990) (affirming denial of severance motion by defendant who was the lone defendant charged in the two counts naming him, was not charged in the RICO conspiracy count, and was the only defendant of 18 indicted together that was not charged jointly in any count with a defendant named in the RICO count); United States v. Lee, 549 F.3d 84 (2d Cir. 2008) (murder for hire conspiracy and separate felon in possession of a firearm charge properly joined); United States v. Ruiz, 894 F.2d 501 (2d Cir. 1990) (bank fraud charges properly joined with attempts to mislead grand jury in public corruption prosecution where actions underlying counts were of the same or similar character); United States v. Monteiro, 871 F.3d 99 (1st Cir. 2017) (joinder of drug conspiracy and Hobbs Act robbery charges that occurred years apart); United States v. Geddes, 844 F.3d 983 (8th Cir. 2017) (sex trafficking and armed career criminal counts properly joined, linked by witness testimony, and did not present a multitude of different defendants and charges); United States v. Annamalai, 939 F.3d 1216 (11th Cir. 2019) (distinct offenses, including money laundering, conspiracy to harbor a fugitive and various frauds properly joined where they all involved the defendant's operation of a Hindu temple).

---

three of which related to cocaine trafficking—were properly joined because they were 'of the same or similar character,'" and factual and temporal differences between the two "do not mean the charges were not of the same or similar character" for joinder purposes.).

b.      No "Substantial Prejudice" Will Result From Joinder

Defendant Jordan's motion also falls far short of the "extremely heavy burden" of showing substantial prejudice that would require severance under Rule 14(a).[6]  Even assuming arguendo that there exists spillover prejudice, it can hardly be characterized as a "miscarriage of justice."  In any event, the Supreme Court has recognized that "limiting instructions are often sufficient to cure any risk of prejudice."  Zafiro, 506 U.S. at 539; see also Spinelli, 352 F.3d at 55 (district court's explicit instruction that jury consider defendants individually remedied spillover prejudice); United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997) (noting that spillover prejudice may be cured through clear judicial instructions); United States v. Rivera, 09 CR 619, 2011 WL 1429125, at *6 (E.D.N.Y. Apr. 13, 2011) (noting "defendants may request any appropriate limiting instruction, or other remedial measure, at trial" to avoid spillover prejudice).

Moreover, as described above, this is not a case in which the nature of the crimes charged are substantially different, or more prejudicial, than that of others.  This is also not a case where the jury will hear evidence of violence as to one defendant that might arguably spill over to taint their view of a co-defendant not charged with such a crime, although such joint trials are commonplace.  Indeed, the longstanding precept in this and other circuits is that separate crimes can and should be joined if a defendant "can be fairly tried on all the charges at once."  United States v. Lotsch, 102 F.2d 35, 36 (2d Cir. 1939).  Defendant Jordan's conclusory and speculative concerns do not warrant breaking with this precedent.  See United States v. Werner, 620 F.2d 922, 929 (2d Cir. 1980) (quoting Lotsch and finding that "[w]hen the accused's conduct on several

---

[6]      It is significant that defendant Washington has not moved to sever Counts Three through Eleven and does not complain that joinder of Jordan's later narcotics and firearms activity will prejudice Washington in any way.

separate occasions can properly be examined in detail, the [joinder] objection disappears, and the only consideration is whether the trial as a whole may not become too confused for the jury.").

        c.      <u>Severance Would Be Inefficient and Unfair</u>

In addition, granting severance "would impair both the efficiency and the fairness of the criminal justice system" by requiring "that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying." <u>Richardson</u>, 481 U.S. at 209-10. So too here as this would require several witnesses, including current and former drug addicts and victims, to testify multiple times regarding their often-traumatic interactions with Jordan. <u>See</u> <u>Bruton</u>, 391 U.S. at 134 (joint trials conserve state funds, diminish inconvenience to witnesses, and avoid delays). Jordan simply cannot show that "the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." <u>Lanza</u>, 790 F.2d at 1019 (internal quotation marks omitted). Such a showing is difficult to make because the "risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits." <u>Jimenez</u>, 824 F. Supp. at 366. This is another separate and independent reason that joint trials are almost always preferred, and another basis to deny Jordan's motion. <u>See</u> <u>Cardascia</u>, 951 F.2d at 482-83 ("policy favoring joinder of trials" rests on an "inevitable tolerance of some slight prejudice to codefendants, which is deemed outweighed by the judicial economies resulting from the avoidance of duplicative trials.").

To retain the considerable benefits of a joint trial and cure any minimal risk of prejudice, the Court may give a limiting instruction similar to that given by the district court in <u>Zafiro</u>, namely, that the government has the burden of proving beyond a reasonable doubt that

each defendant committed the crimes with which he has been charged, and separate consideration should be given to each defendant and each charge based on the evidence applicable to that defendant.  See Order Denying Severance DE 269 at 10-11; Zafiro, 506 U.S. at 540-41; see also DeVillio, 983 F.2d at 1192-93 (upholding the Honorable I. Leo Glasser's denial of severance where an explicit limiting instruction had been used).  As such, to require multiple trials involving highly related conduct would be the height of inefficiency.

### 2.   The Government Will Fully Comply with *Bruton*

The risk of any Bruton concerns will be addressed by appropriate redactions to any statement from either of the defendants, as well as cautionary instructions during related testimony and modifications to the Court's jury charge.  Indeed, at present, the government has no intention of introducing either the March 3, 2003 statement to law enforcement or the December 2003 statement to Playboy magazine.  This effectively moots defendant Jordan's severance motion on these grounds.

To the extent that any of the other aforementioned statements implicate Bruton, "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes" does not violate Bruton and eliminates any potential severance argument.  Tutino, 883 F.2d at 1135 ; see also Yousef, 327 F.3d at 149 (upholding redaction of co-defendant's name to "my neighbor"); United States v. Kyles, 40 F.3d 519, 526 (2d Cir.1994) (upholding redaction of co-defendant's name to "he"); United States v. Williams, 936 F.2d 698, 701 (2d Cir. 1991) (upholding redaction of co-defendant's name to "this guy"); United States v. Benitez, 920 F.2d 1080, 1087 (2d Cir.1990) (upholding redaction of co-defendant's name to "friend").

\*      \*      \*

In summary, applying the "commonsense rule," severance is not warranted in light of the factual overlap among charges and evidence, the extraordinary inefficiency that would result from severance, and the lack of prejudice to the defendants from a joint trial.  Shellef, 507 F.3d at 98.

## CONCLUSION

For the foregoing reasons, the government respectfully submits that the defendants' motions should be denied in their entirety.

Dated:      Brooklyn, New York
            May 9, 2021

                              BREON PEACE
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


                    By:       _____/s/_____
                              Artie McConnell
                              Mark Misorek
                              Assistant United States Attorneys
                              (718) 254-7000

27