CCC:JAM/MEM
F.#2018R00082

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -                      Docket No. 20-CR-305 (S-1) (LDH)

KARL JORDAN, JR.,
     also known as "Little D"
     and "Noid," and
RONALD WASHINGTON,
     also known as "Tinard,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT JORDAN'S MOTIONS TO SUPPRESS

BREON PEACE
United States Attorney
Eastern District of New York

Artie McConnell
Mark Misorek
Assistant U.S. Attorneys
     (Of Counsel

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT BACKGROUND ......................................................................................... 2

    I.     The Indictment ............................................................................................ 2

    II.    Jordan's Arrest and Post-Arrest Statement ................................................ 2

    III.   The Search of Jordan's Cell Phones ........................................................... 5

ARGUMENT ..................................................................................................................... 8

    I.     The Government's Search Warrant Contains No False or Misleading
         Information .................................................................................................. 8

         A.    Applicable Law ................................................................................ 8

         B.    Argument ........................................................................................ 12

    II.    The Defendant's Waiver of His *Miranda* Rights Was Lawful and His
         Statements Are Admissible .......................................................................... 14

         A.    Applicable Law ................................................................................ 15

         B.    Argument ........................................................................................ 18

CONCLUSION .................................................................................................................. 20

## TABLE OF AUTHORITIES

**Federal Cases**

Berghuis v. Thompkins, 560 U.S. 370 (2010) ........................................................ 15

California v. Beheler, 463 U.S. 1121 (1983) ........................................................ 19

Campaneria v. Reid, 891 F.2d 1014 (2d Cir. 1989).............................................. 18

Colorado v. Connelly, 479 U.S. 157 (1986) .................................................... 15, 18

Colorado v. Spring, 479 U.S. 564 (1987) ................................................... passim

Culombe v. Connecticut, 367 U.S. 568 (1961)...................................................... 18

Franks v. Delaware, 438 U.S. 154 (1978).......................................................... 9, 13, 14

Illinois v. Gates, 462 U.S. 213 (1983) ................................................................ 12

Lugosch v. Pyramid Co., 435 F.3d 110 (2d Cir. 2006)........................................ 21

Massachusetts v. Upton, 466 U.S. 727 (1984)...................................................... 11

Moran v. Burbine, 475 U.S. 412 (1986) ......................................................... 15, 16

Oregon v. Elstad, 470 U.S. 298 (1985).............................................................. 18

United States v. Amodeo, 71 F.3d 1044 (2d Cir. 1995) ...................................... 21

United States v. Anderson, 929 F.2d 96 (2d Cir. 1991)...................................... 20

United States v. Awadallah, 349 F.3d 42 (2d Cir. 2003).......................... 9, 10, 13

United States v. Canfield, 212 F.3d 713 (2d Cir. 2000) ...................................... 10

United States v. Caruso, 684 F. Supp. 84 (S.D.N.Y. 1988)................................ 15

United States v. Colkley, 899 F.2d 297 (4th Cir.1990) ...................................... 10

United States v. Davis, No. 17-CR-615 (JMA), 2021 WL 826261 (E.D.N.Y. Mar. 3, 2021)........ 9

United States v. Doe, 63 F.3d 121 (2d Cir. 1995) .............................................. 21

United States v. Ferguson, 758 F.2d 843 (2d Cir. 1985) ................................... 10

United States v. Gillette, 383 F.2d 843 (2d Cir. 1967) .................................. 14, 15

United States v. Harris, 403 U.S. 573 (1971) ..................................................... 11

United States v. Helbrans, No. 19-CR-497-01 (NSR),
    2021 WL 3595720, (S.D.N.Y. August 13, 2021) ...................................................... 19

United States v. Marin–Buitrago, 734 F.2d 889 (2nd Cir.1984) .................................... 11

United States v. Martin, 426 F.3d 68 (2d Cir. 2005) ..................................................... 10

United States v. Mitchell, 966 F.2d 92 (2d Cir. 2015) ................................................... 17

United States v. Mullens, 536 F.2d 997 (2d Cir. 1976) ................................................. 18

United States v. Okwumabua, 828 F.2d 950 (2d Cir. 1987) ............................... 17, 18, 20

United States v. Olmstead, 698 F.2d 224 (4th Cir. 1983) .............................................. 18

United States v. Orr, 819 Fed. Appx. 756 (11th Cir. 2020) ........................................... 17

United States v. Pena, 961 F.2d 333 (2d Cir. 1992) ...................................................... 14

United States v. Plugh, 648 F.3d 118 (2d Cir. 2011) ............................................... 15, 16

United States v. Prudden, 424 F.2d 1021 (5th Cir. 1970) .............................................. 17

United States v. Rajaratnam, 719 F.3d 139 (2d Cir. 2013) ........................................... 10

United States v. Rivera, 750 F. Supp. 614 (S.D.N.Y. 1990) .......................................... 10

United States v. Roberts, 660 F.3d 149 (2d Cir. 2011) ................................................. 18

United States v. Salameh, 152 F.3d 88 (2d Cir. 1998) ....................................... 9, 10, 13

United States v. Singh, No. 12-CR-121, 2012 WL 2501032 (E.D.N.Y. June 27, 2012) ............. 15

United States v. Steppello, 664 F.3d 359 (2d Cir. 2011) ............................................... 11

United States v. Syslo, 303 F.3d 860 (8th Cir. 2002) .................................................... 17

United States v. Taylor, 745 F.3d 15 (2d Cir. 2014) ..................................................... 15

United States v. Viscioso, 711 F. Supp. 740 (S.D.N.Y. 1989) ....................................... 14

United States v. Wagner, 989 F.2d 69 (2d Cir. 1993) ................................................... 11

United States v. Wapnick, 60 F.3d 948 (2d Cir. 1995) ............................................ 11, 14

United States v. Washington, 431 U.S. 181 (1977) ....................................................... 20

United States v. Watson, 404 F.3d 163 (2d Cir. 2005) .................................................. 14

United States v. Whitley, 249 F.3d 614 (7th Cir. 2001) ................................................. 10

<u>United States v. Zagari</u>, 111 F.3d 307 (2d Cir. 1985)..................................................... 11

**Federal Statutes**

18 U.S.C. § 1349................................................................................................. 5, 7, 12

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in opposition to defendant Karl Jordan Jr.'s motions to suppress "all data obtained from [defendant Jordan's] phones and all fruits of the poisonous tree regarding the government's investigation," and suppressing the defendant Jordan's post-arrest statement.   ECF Docket No. 93 ("Jordan Memorandum").[1]  Both defendants are charged with the narcotics-related murder of Jason Mizell, also known as "Jam Master Jay," as alleged in Counts One and Two of the Superseding Indictment. Defendant Jordan is also charged with additional narcotics offenses, as alleged in Counts Three through Eleven.

Defendant Jordan moves to suppress "all data obtained from Mr. Jordan's phones and all fruits of the poisonous tree regarding the government's investigation," and his "post-arrest statement."  Jordan Memorandum, ECF No. 93, p. 6.

The defendant's suppression motions are without merit.  The challenged evidence obtained from the defendant's cell phones was obtained pursuant to a validly issued search warrant, and the defendant's conclusory allegations of government misconduct in securing the warrant rely on inaccurate factual allegations and are entirely unsupported by relevant precedent.  Similarly, the defendant's post-arrest statement was preceded by a knowingly, intelligent and voluntary <u>Miranda</u> waiver.  Accordingly, the Court should deny the defendant's motions without a hearing.

---

[1]      Defendant Ronald Washington did not file any pre-trial suppression motions.

1

RELEVANT BACKGROUND[2]

I.     The Indictment

On August 13, 2020, a grand jury in the Eastern District of New York returned an indictment charging Karl Jordan Jr. and Ronald Washington with one count of murder while engaged in narcotics trafficking, in violation of Title 21, United States Code, Section 848(e)(1)(A), and one count of firearm-related murder, in violation of Title 18, United States Code, Section 924(j)(1), for the October 30, 2002 murder of Mizell.  Jordan was also charged with one count of conspiracy to distribute cocaine and seven counts of cocaine distribution, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), respectively.

II.    Jordan's Arrest and Post-Arrest Statement

Jordan was arrested on or about August 16, 2020.  At the time of his arrest, the defendant was in possession of two cellular telephones, namely, one black LG Model XM-320TA and a white iPhone.  Jordan was taken to a field office used by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), where the defendant was advised of his Miranda rights, which he waived.  As admitted in his motion, "[a]t the time that Mr. Jordan as interviewed…he was aware that he had been indicted on the drug charges."  Jordan Memorandum, ECF. No. 93, p. 11.  The Miranda colloquy and the defendant's subsequent statement was recorded on video, attached hereto as Government Exhibit ("GX") 1, and excerpted in pertinent part below:

> AGENT 1: Have a seat here.  Alright. Moving forward we obviously told you we're going to shoot you straight.  And once we got here we'd have an opportunity to talk.  Okay?  Before we do that, for your protection and for ours, we have to read you your rights.  You had your rights read to you before?
>
> DEFENDANT: Yes.

---

[2]     Unless expressly consented to herein, the government denies the factual allegations in the defendant's motions.

AGENT 1: Okay. So I'm going to read them to you.  And then you're going to have the opportunity to read them, right?  Okay. you have the right to remain silent.  Do you understand?

DEFENDANT: Si.

AGENT 1: I'm sorry?

DEFENDANT: Yes.

AGENT 1: Anything you say can and will be used against you in court. Do you understand?

DEFENDANT: Yes.

AGENT 1: You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning.  Do you understand?

DEFENDANT: Yes.

AGENT 1:  If you cannot afford a lawyer, one will be appointed for you if you wish before any questions begins.

DEFENDANT: Yes.

AGENT 1: If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

DEFENDANT: Yes.

AGENT 1: Okay. Now you read the bottom.

DEFENDANT: (Reads softly).

AGENT 1: We're good?

DEFENDANT: Yeah. I'm ready.

AGENT 1: Okay. So, you want to hear what we have to say?

DEFENDANT: Yeah I want to know what I'm being charged with.

AGENT 1:  Okay.  Before we—like I said, we have to—this is for you and for us too.  We don't want to get in trouble.  We don't want

3

anybody to be in harms way.  Just so there's an understanding of
this.  So we read this to you.  You read it.  Are you willing to speak
with us now?

DEFENDANT: Yeah I don't want to sign anything though.  I'm not
signing it.

AGENT 1:  Okay.  That's fine. But you've read your rights.  You
know what they are and you're willing to speak with us?

DEFENDANT:  Yeah.  I want to understand what I'm being charged
with. you never told me what I was charged with.

AGENT 1:  Okay fair enough.  So, what we get.  You want to start
as far as--

AGENT 2:  When we were talking in the car I explained to you that
sometimes we're looking for somebody, a target, right, and then we
see other things.

DEFENDANT:  But you still are not being straight forward. you
said you were going to be straight forward.

AGENT 2:  Yeah but we're getting to that.  We're going to get to
that.  So, obviously we brought you here because you've been
selling drugs.  Does that sound correct to you?  Well, I mean do you
sell drugs?  Yes or no?

DEFENDANT:  No.

GX 1, 17:55-20:20.  As detailed above, in addition to being orally advised of his rights, the

defendant was provided with a written Miranda card to review, which he refused to sign.  While

the defendant was not told at the outset that he was charged with Mizell's murder in addition to

the drug trafficking offenses, no affirmative misrepresentations were made to the defendant

about the charges, during the Miranda colloquy or thereafter.

During the interview, the defendant spoke extensively about his narcotics

trafficking activities.  He was later told that he was also charged with Mizell's murder.  He

continued to speak, providing a demonstrably false alibi.  At no point in the interview did the defendant invoke his right to remain silent or ask for an attorney.

III.     The Search of Jordan's Cell Phones

On or about August 26, 2020, the government submitted an application to search the two cell phones recovered from Jordan incident to his arrest.  See 20-MJ-731 (under seal).  In support of that application, the government submitted a sworn affidavit from a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosive ("ATF") (the "First Affidavit").  A copy of the First Affidavit is attached hereto as Government Exhibit 2.  The First Affidavit relied on Jordan's numerous sales to undercover law enforcement agents in 2017.  It also included some of Jordan's post-Miranda statement, where he "admitted, in sum and substance, to selling narcotics from as early as 2015…alternat[ing] his statements between the past and the present and stated that he sold drugs when he needed money."  GX 2, pp. 6-7.  Finally, the First Affidavit also relied on the affiant's training and experience, which described, inter alia, the common uses of multiple cell phones in furtherance of narcotics trafficking activity and the long retention periods for potentially relevant evidence on electronic devices.  See GX 2, pp. 7-10.

The Honorable Steven M. Gold, Magistrate Judge for the Eastern District of New York, denied the warrant, finding that the undercover buys were too remote in time and Jordan's post arrest statements too imprecise, vacillating between inculpatory and exculpatory.  The warrant was denied with leave to represent.[3]  See GX 2, p. 1 (containing order appearing in top right corner, reading, in part "Application denied for lack of showing of probable cause.  SO ORDERED.")

---

[3]     Judge Gold had a phone conversation with one of the undersigned Assistant United States Attorneys regarding the perceived deficiencies in the affidavit and the ability to re-present the application with additional evidence.

On or about September 17, 2020, a proffer was conducted with ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████    ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ The undersigned Assistant United

States Attorney explained the terms of the written proffer agreement, which is attached hereto as

Government Exhibit 3. Specifically, it was explained to ████████████ that the proffer was not

a cooperation agreement; that the agreement did not apply to any false statements he might make

during the proffer; and that any statements █████████████ could be used to develop other

investigative leads in his and other cases. After consultation with his attorney, ████ executed the

proffer agreement and spoke extensively regarding a variety of topics, including Jordan's narcotics

trafficking activities.

During the proffer, █████ stated, in sum and substance, the following, inter alia:

- That Jordan ████████████████████ had known each other their entire lives and grew up together in Hollis, Queens; and that Jordan began selling narcotics at age 14 through 2017. ████████████████ Jordan had continued to sell cocaine and crack cocaine through January 2020, ████████████████████████████████████████████

- In or about January of 2020, ████████████ Jordan was selling approximately 100 to 200 grams of cocaine about every two weeks;

- ████████████ Jordan's current source of supply and stated that Jordan typically sold to a group of buyers on Long Island who Jordan had dealt with for many years, making approximately $10,000 per month;

- Jordan utilized various cell phones to communicate with his buyers, and that on a number of occasions, ████████████████████████████████████████ However, Jordan refused; and

- Jordan had never had a legitimate job in his entire life aside from distributing narcotics.

On or about September 24, 2020, the government submitted a second application to search Jordan's two cell phones.  See 20-MJ-731 (under seal).  In support of that application, the government submitted a revised affidavit (the "Second Affidavit").  A copy of the Second Affidavit is attached hereto as Government Exhibit 4.  In addition to the information in the First Affidavit, the government added some of the information from the proffer ████.  See GX 4, pp. 7-8.  This included that "████████ Jordan had not stopped dealing in 2017, ██ ████████ Jordan dealt cocaine and/or cocaine base from the age of 14 until January 2020 ████████████████████ GX 4, p. 8.  In the Second Affidavit, the government clearly stated that the information was obtained during a proffer; ████ "was currently in federal custody ████████████ ████████████████████ ; and that ████████████████████ ████████ GX 4, p. 7 n. 3.  Additionally, the affidavit noted that:

> the information provided ████ during the proffer session has proven to be reliable in that the information provided by him has been corroborated by other sources, including surveillance by law enforcement officers, audio and video recordings and laboratory analysis.  ████████████ credible information, corroborated by another witness previously interviewed by law enforcement, on a 2010 homicide in Queens where Jordan and a coconspirator engaged in an argument with a rival drug dealer (the "Victim").  After Jordan physically attacked the Victim and began to lose the altercation, Jordan's coconspirator shot the Victim approximately six times, causing the Victim's death.

Id.

Judge Gold authorized the search warrant on or about September 24, 2020.  Law enforcement executed the warrant, which yielded additional evidence of Jordan's narcotics trafficking, including:

- Numerous photographs and videos of Jordan holding stacks of hundred-dollar bills and other denominations of money;

- Photographs and videos of Jordan wearing and examining diamond encrusted jewelry. In one such video, Jordan is rapping that he has "100 pounds on the flip" – a reference to reselling or "flipping" a quantity of narcotics, and "30 in the clip" – a reference to the amount of ammunition in a semi-automatic firearm; and

- Music video clips where Jordan references narcotics trafficking and his possession and use of firearms. For example, in one video he raps about "carrying magnums all the time, not just when I get some ass." In another, Jordan raps that "boy I a savage, bullets in my gun gonna keep n-ggas off me…I had them shooters delivered to your crib like the Amazon Prime…I'm from Hollis where I learned from my past so I move around Queens with a gun and a mask."

On March 4, 2021, the grand jury returned a superseding indictment, which charged Jordan with additional crimes, including one count of conspiracy to distribute 280 grams or more of cocaine base, in violation of Title 21, United States Code, Sections 846, 841(b)(1)(A)(iii) and 841(b)(1)(C), and one count of use of firearms in connection with a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i).

<u>ARGUMENT</u>

I.   <u>The Government's Search Warrant Contains No False or Misleading Information</u>

The defendant flatly alleges that the government "found a witness and got him to say what they needed" in order to establish probable cause to search the cell phones and moves to controvert the search warrant. Jordan Memorandum, p. 9. Such a motion is conclusory, wholly devoid of corroboration or support, and unsupported by caselaw. As described below, there is nothing in the record necessitating a hearing on this issue, much less suppression of evidence. Jordan's motion should be denied.

A.   <u>Applicable Law</u>

Warrant affidavits are entitled to a "presumption of validity." <u>Franks v. Delaware,</u>

438 U.S. 154, 171 (1978).  As to a motion to controvert, "[o]nce the magistrate judge has issued a

warrant, the reviewing court must give substantial deference to the magistrate's probable cause

determination.  As the Supreme Court has long held, after-the-fact scrutiny by courts of the

sufficiency of an affidavit should not take the form of de novo review."  United States v. Davis,

No. 17-CR-615 (JMA), 2021 WL 826261, at *5 (E.D.N.Y. Mar. 3, 2021).

    Under the Supreme Court's framework in Franks v. Delaware, to obtain a hearing

based on allegations of a search warrant affiant's deliberately misleading and recklessly false

statements, "a defendant must make *a substantial preliminary showing* that: (1) the claimed

inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard

for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable

cause finding."  438 U.S. 154, 155-56 (1978) (emphasis added); United States v. Salameh, 152

F.3d 88, 113 (2d Cir. 1998) (internal quotation marks omitted); see also United States v.

Awadallah, 349 F.3d 42, 64 (2d Cir. 2003).   The Supreme Court explained the limited

circumstances where such a hearing is required in Franks:

> to mandate an evidentiary hearing, the challenger's attack must be
> more than conclusory and must be supported by more than a mere
> desire to cross examine.  There must be allegations of deliberate
> falsehood or of reckless disregard for the truth, and those allegations
> must be accompanied by an offer of proof.  They should point out
> specifically the portion of the warrant affidavit that is claimed to be
> false; and they should be accompanied by a statement of supporting
> reasons.  Affidavits or sworn or otherwise reliable statements of
> witnesses should be furnished, or their absence satisfactorily
> explained.  Allegations of negligence or innocent mistake are
> insufficient.

438 U.S. at 171.

    A defendant seeking to make the first required showing of an intentional or reckless

misstatement or omission must show more than inadvertent error.  "[E]very statement in a written

9

affidavit does not have to be true," United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005), and "the mere intent to exclude information is insufficient…[because] every decision not to include certain information in the affidavit is intentional insofar as it is made knowingly…An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." Awadallah, 349 F.3d at 67-68 (internal quotation marks omitted). "To prove reckless disregard for the truth," a defendant must "prove that the affiant in fact entertained serious doubts as to the truth of his allegations." Id. (quoting United States v. Whitley, 249 F.3d 614, 621 (7th Cir. 2001)).

        The moving defendant must also prove that any misstatements or omissions alleged were material. To determine if the false information was material, i.e., "necessary to the issuing judge's probable cause determination . . . a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." United States v. Canfield 212 F.3d 713, 718 (2d Cir. 2000) (citing Salameh, 152 F.3d at 113). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." Id. (quoting United States v. Ferguson, 758 F.2d 843, 848 (2d Cir. 1985)). Likewise, if the omitted material had been included in the affidavit and the affidavit would still establish probable cause, the omissions were not material to the probable cause determination and suppression is inappropriate. See United States v. Rajaratnam, 719 F.3d 139, 146 (2d Cir. 2013). "Omissions are not subject to the same high level of scrutiny as misstatements." United States v. Rivera, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). As the Fourth Circuit has written: "the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." United States v. Colkley, 899 F.2d

297, 301 (4th Cir.1990).  "[F]acts omitted from a warrant affidavit are not material unless they cast

doubt on the existence of probable cause . . . The omitted information and the information in the

affidavit must be considered as a whole in determining if probable cause continues to exist."

United States v. Marin–Buitrago, 734 F.2d 889, 895 (2d Cir. 1984) (citations omitted).  United

States v. Zagari, 111 F.3d 307, 322 (2d Cir. 1985) (no Franks hearing required where special agent,

relying in part on an informant, did not reveal impeachment material that had a potential bearing

on the informant's credibility).

Because the focus of the Franks decision is intentional or reckless misstatements

*by an affiant*, no hearing or suppression of evidence is required if a private informant lies to a law

enforcement officer who, believing the information, then sets out that information in an affidavit.

See United States v. Wapnick, 60 F.3d 948, 956 (2d Cir. 1995).  While tips by paid or professional

informants are deserving of special scrutiny, see United States v. Wagner, 989 F.2d 69, 73 (2d Cir.

1993), there is less reluctance to rely on statements made by informants who are participants or

co-conspirators in a crime, on the theory that their motive to fabricate is reduced.  See United

States v. Steppello, 664 F.3d 359, 366 (2d Cir. 2011) (reversing suppression order finding lack of

probable cause where informant was "a participant in the crime," gave "information to the officers

in person," and "was motivated to be truthful to receive leniency.").  Indeed, an informant's

veracity can be shown in a variety of ways, and so long as "an informant's declaration is

corroborated in material respects, the entire account may be credited, including parts without

corroboration."  Wagner, 989 F.2d at 73; see also Massachusetts v. Upton, 466 U.S. 727 (1984)

(probable cause established when untested informant's description of stolen property matched

police reports of property taken in recent burglaries.); United States v. Harris, 403 U.S. 573, 583

(1971) (reliability of informant information heightened because it contained statements against

11

informant's penal interest).  Ultimately, courts must apply a totality of circumstances analysis to balance "all the various indicia of reliability attending an informant's tip."  Illinois v. Gates, 462 U.S. 213, 230-234 (1983).

B.    Argument

The defendant has not made the "substantial preliminary showing" that the alleged inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth, as required by Franks.  Indeed, he makes no showing at all, instead making a perfunctory accusation that the government either made up or intentionally elicited false information during ▮▮▮▮▮ proffer:

> The government did not have any basis to assert that Mr. Jordan sold drugs past 2017 (when the undercover buys were recorded) or that information would have been in the original August search warrant – but they wanted his phones anyway, so they found a witness and got him to say what they needed…It is clear that, unsatisfied with ▮▮▮▮ first response, the government pushed him to say what it wanted: that Jordan's activity continued until 2020. Without that extra assertion, the application would not have been granted. This type of government interference necessitates suppression, or the Court should order a Franks hearing.

Jordan Memorandum, ECF No. 93, p. 4.  Despite making such serious accusations of government misconduct, the defendant does not submit "affidavits or sworn or otherwise reliable statements of witnesses" in support of his theory, as required by Franks.

This is because the defendant's accusations are baseless.  As described herein, the ▮▮▮▮ interview took place pursuant to a written proffer agreement and in the presence of several case agents, prosecutors from two different districts, and, most importantly, ▮▮▮▮ defense counsel.  ▮▮▮▮ advised of the terms of the agreement, how his statements could be used and the consequence for false statements.  That the government could "push" ▮▮▮▮ "say what it wanted" in this context—with his attorney present—strains credulity.  Jordan Memorandum, ECF

No. 93, p. 4.  Regardless, the complete lack of support for such a serious accusation is fatal to the defendant's motion and his call for a <u>Franks</u> hearing—the "substantial preliminary showing" is utterly lacking.  438 U.S. 154, 155-56 (1978) ("the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine . . . allegations must be accompanied by an offer of proof . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence explained."); <u>Salameh</u>, 152 F.3d at 113 (internal quotation marks omitted); <u>see also</u> <u>United States v. Awadallah</u>, 349 F.3d 42, 64 (2d Cir. 2003).

Nevertheless, the affidavit contains no false information, no material omissions, and provides ample indicia of ▮▮▮ reliability.  Specifically, the affidavit discusses the basis for ▮▮▮ knowledge, including his ▮▮▮ long-standing association with Jordan as well as his intimate knowledge of Jordan's criminal activities.  The affidavit also disclosed appropriate impeachment material, making clear that ▮▮▮ "was currently in federal custody in ▮▮▮ ▮▮▮ GX 4, p. 7.  The nature of the in-person interview— conducted under a written proffer agreement "in an attempt to secure a cooperation agreement"— was also explicit.  Moreover, the affidavit discussed how the information provided by ▮▮▮ had been vetted after the proffer and before the warrant application was made.  This included not only information about Jordan's narcotics trafficking, but also an uncharged, corroborated homicide that involved Jordan.  <u>Id</u> at n.3.  Accordingly, there are no misstatements or omissions in the affidavit and ▮▮▮ general veracity, reliability, and basis of knowledge is sufficiently established through the totality of the circumstances.

Not surprisingly, nowhere in his motion does Jordan claim the information provided ▮▮▮ is actually false, but rather, baldly claims, without basis, that ▮▮▮ statements

were somehow procured by government misconduct.  While this contention is wholly specious,

even if ███ had fabricated his proffer statement, it would not provide the basis for relief the

defendant seeks, as it was not procured by government misconduct.  See Wapnick, 60 F.3d at 956

("if an *informant* knowingly or recklessly makes a false statement to an affiant, that does not

present grounds to challenge the search warrant so long as the affiant in good faith accurately

represents what the informant told him.") (emphasis in original).

       The defendant's motion to controvert the search warrant is factually and legally

meritless and should be denied without a hearing.  The defendant has manifestly failed to make

the "substantial preliminary showing" under the first prong of the Franks test that Burns'

statements are somehow inaccurate and are the result of the affiant's "deliberate falsehood or

reckless disregard for the truth."  438 U.S. 154, 155-56 (1978).

II.    <u>The Defendant's Waiver of His *Miranda* Rights Was Lawful and His Statements Are Admissible</u>

       The defendant claims that the fact that he was not told that he was charged with

Mizell's murder in addition to the narcotics charges necessarily renders his Miranda waiver

involuntary and his subsequent statements inadmissible.[4]  This argument runs contrary to the

---

[4]    Though the defendant does not ask for one, there is no basis for an evidentiary hearing.
The defendant puts forth a purely legal argument in favor of suppression and makes no factual
arguments regarding coercion or involuntariness.  Furthermore, the defendant has failed to
submit a sworn declaration of fact in support of his motion based on his personal knowledge.
See United States v. Watson, 404 F.3d 163, 167 (2d Cir. 2005); United States v. Pena, 961 F.2d
333, 339 (2d Cir. 1992) (hearing on a motion to suppress not required unless the defendant's
submissions raise a "sufficiently definite, specific, detailed, and nonconjectural" factual basis for
the motion).  Put differently, there must be a material factual dispute to warrant a hearing.  See
United States v. Gillette, 383 F.2d 843, 848 (2d Cir. 1967) (stating that suppression hearing is
available only if there is a "factual issue to be resolved"); United States v. Viscioso, 711 F. Supp.
740, 745 (S.D.N.Y. 1989) ("[T]he defendant must show that disputed issues of material fact exist
before an evidentiary hearing is required.") (internal quotation marks omitted).  When the
defendant fails to support his factual allegations with a sworn declaration or affidavit based on
personal knowledge, a material factual dispute does not exist and a suppression hearing need not

14

Supreme Court's explicit holding in <u>Colorado v. Spring</u>, 479 U.S. 564 (1987) and over thirty years of ensuing caselaw: a defendant's decision to waive his Fifth Amendment privilege against self-incrimination may be knowing and voluntary, even if the defendant was not aware that he would be questioned about separate, unrelated or additional crimes.  <u>Spring</u>, 479 U.S. at 575-76 (once defendant waived his Miranda rights in connection with arrest on firearms charges, police could question him about unrelated murder).  As such, the defendant's motion to suppress his post-arrest statement should be summarily denied without a hearing.

A.    <u>Applicable Law</u>

Generally, a statement made by the accused "during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [Miranda] rights when making the statement."  <u>United States v. Taylor</u>, 745 F.3d 15, 23 (2d Cir. 2014) (quoting <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 382 (2010)).  The government must show by a preponderance of the evidence that the defendant knowingly and intentionally waived his Miranda rights.  <u>See</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986); <u>United States v. Plugh</u>, 648 F.3d 118, 127 (2d Cir. 2011).  A waiver is knowing and intelligent if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  <u>Plugh</u>, 648 F.3d at 127 (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)) (internal quotation marks omitted).  A waiver is voluntary when "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  Id. (internal quotation marks omitted).  "The question of waiver must be determined on the particular

---

be held.  <u>See</u> <u>Gillette</u>, 383 F.2d at 848; <u>United States v. Caruso</u>, 684 F. Supp. 84, 87 (S.D.N.Y. 1988).  Accordingly, "[c]ourts in this Circuit have repeatedly denied motions to suppress, without a hearing, where defendants have failed to provide affidavits alleging facts based on personal knowledge."  <u>United States v. Singh</u>, No. 12-CR-121, 2012 WL 2501032, at *2 (E.D.N.Y. June 27, 2012).

facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Id. at 127 (alteration and internal quotation marks omitted).

However, the Supreme Court has held that "a valid waiver does not require that an individual be informed of all information useful in making his decision or all information that might…affec[t] his decision to confess." Spring, 479 U.S. at 576-77 (quoting Burbine, 475 U.S. at 422). In so holding, the Court in Spring clearly stated that "[w]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights . . . a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Id.

In Spring, the Court upheld the lawfulness of a defendant's Miranda waiver and the voluntariness of subsequent statements where the defendant was arrested on firearms charges but was later questioned about unrelated murder. Given the factual similarities to the instant case, the Supreme Court's language in Spring is particularly instructive:

> There is no doubt that Spring's decision to waive his Fifth Amendment privilege was voluntary. He alleges no coercion of a confession by physical violence or other deliberate means calculated to break [his] will, and the trial court found none. His allegation that the police failed to supply him with certain information does not relate to any of the traditional indicia of coercion: the duration and conditions of detention…the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control. Absent evidence that Spring's will [was] overborne and his capacity for self-determination critically impaired because of coercive police conduct, his waiver of his Fifth Amendment privilege was voluntary under this Court's decision in Miranda. There also is no doubt that Spring's waiver of his Fifth Amendment privilege was knowingly and intelligently made: that is, that Spring understood that he had the right to remain silent and that anything he said could be used as evidence against him. The Constitution does not require that a

> criminal suspect know and understand every possible consequence
> of a waiver of the Fifth Amendment privilege.

479 U.S. at 574-75. (emphasis added) (internal citations omitted)

Since the Spring holding, courts in this district and throughout the country have consistently held that a suspect, in both custodial and non-custodial settings, need not be advised of the nature of the investigation or charges to lawfully waive Miranda or make voluntary, admissible statements.  See, e.g., United States v. Okwumabua, 828 F.2d 950, 953-55 (2d Cir. 1987) (citing Spring and rejecting the argument that it was "fundamentally unfair to elicit incriminating testimony from a potential defendant without first informing him of his target status," and that "there was no legal or moral duty to inform the defendant" about the subject matter or existence of the criminal investigation.); United States v. Mitchell, 966 F.2d 92, 100-01 (2d Cir. 2015) (finding no "trickery or deception" violative of the Due Process Clause of the Fifth Amendment where questioning agent "displayed his credentials" and made "no affirmative misrepresentations concerning the criminal purpose of the inquiry."); United States v. Syslo, 303 F.3d 860, 865-66 (8th Cir. 2002) (citing Spring and finding that "an officer may change the topic of interrogation without notice because a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege."); United States v. Prudden, 424 F.2d 1021, 1032 (5th Cir. 1970), cert. denied, 400 U.S. 831 (1970) (no Constitutional infirmity or "duty to speak" concerning the purpose of agent's investigation); United States v. Orr, 819 Fed. Appx. 756, 762-63 (11th Cir. 2020) (citing Spring and finding "none of the usual markers of police misconduct or coercion" and noting that even if "the officers lied…about the facts, misrepresentations of fact are generally not enough to render a confession

involuntary" where "the officers did not tell [defendant] that they had been investigating him for several weeks and that they had significant cellphone text and email evidence against him.).

Nor does the Constitution require that someone be questioned only in the manner most likely to ensure that he gives the decision whether to speak careful thought.  See, e.g., Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989) (defendant questioned while in the hospital suffering from a knife wound, in pain, had tubes running in and out of his body, and complained of dizziness); see also United States v. Roberts, 660 F.3d 149, 157 (2d Cir. 2011) ("the Fifth Amendment does not protect against hard choices" (internal quotation marks omitted)); United States v. Mullens, 536 F.2d 997, 1000 (2d Cir. 1976) (there is a difference between "those choices which are physically or psychologically coerced and those which are merely difficult"). In short, the Fifth Amendment is only violated by "government misconduct" that is "coercive." Colorado v. Connelly, 479 U.S. at 163; see also Oregon v. Elstad, 470 U.S. 298, 312 (1985) (Fifth Amendment prohibits "coercion" effected "by physical violence or other deliberate means calculated to break the suspect's will").

B.    Argument

In waiving his Miranda rights and making a statement, the defendant's "will was not overborne and his capacity for self-determination was not critically impaired by the agent's silence." Okwumabua, 828 F.2d at 955 (quoting United States v. Olmstead, 698 F.2d 224, 227 (4th Cir. 1983).  The totality of the circumstances shows that, despite the agent's silence about the murder charges, the defendant's waiver and statements were voluntary and "the product of [his] essentially free and unconstrained choice."  Culombe v. Connecticut, 367 U.S. 568 (1961).

Other than not being told at the time of his Miranda waiver that he was charged with Mizell's killing—in addition to the narcotics offenses that he was aware of—the defendant

18

alleges no other coercive, threatening or deceptive conduct.  Indeed, the defendant does not submit

an affidavit claiming that his will was overborne, merely that "when agents began questioning Mr.

Jordan regarding the murder, he was stunned and caught off guard."  Jordan Memorandum, ECF.

No. 93, p. 11; see also United States v. Helbrans, No. 19-CR-497-01 (NSR), 2021 WL 3595720,

(S.D.N.Y. August 13, 2021) (citing California v. Beheler, 463 U.S. 1121, 1125 n.3 (1983), finding

no factual dispute requiring a hearing where the defendant "has neither provided an affidavit

attesting that [agents] overbore his free will.").  This is because the indisputable facts are to the

contrary, as there exists an irrefutable audio and video recording showing defendant to be

ambulatory, oriented to his surroundings, coherent, responsive to both pedigree and substantive

questions, and wholly lucid throughout the entire process.  More generally, the demeanor of the

interviewing agents was friendly, calm and not overbearing in any way.  Nor was the context of

the interview coercive—the defendant remained without handcuffs, and agents were dressed in

plain clothes and displayed no weapons.

Raising no other issues or basis for suppression, the defendant's contention fails as

a matter of law.  The defendant simply ignores the Supreme Court's explicit ruling in Spring,

which held that that mere silence by law-enforcement officials concerning the subject matter of

interrogation is not "trickery" sufficient to invalidate a suspect's waiver of Miranda rights, and

that a suspect's awareness of all the potential topics of questioning in advance of the interrogation

was not relevant in determining whether there was a voluntary, knowing, and intelligent waiver of

the Fifth Amendment privilege against self-incrimination.  479 U.S. 564, 576-77.  Indeed, the facts

of Spring are directly applicable to the instant case, and the Spring court found that agents' failure

to tell the defendant that he could be questioned about a murder at the time he was interviewed

about unrelated charges did not affect, in a constitutionally significant way, the defendant's

decision to waive his Fifth Amendment privilege.  Id.  It follows that law enforcement need not inform a witness of the nature of its investigation, see Okwumabua, 828 F.2d at 953, much less his individual status in the investigation, see United States v. Washington, 431 U.S. 181, 189-90, n.6 (1977); Spring at 576-77 (there is no requirement that law enforcement give information that might affect "the wisdom" of speaking, and the Constitution does not "require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.").

To be sure, the fact that law enforcement need not inform an individual about the nature of the charges or an investigation, this does not necessarily mean that it may engage in affirmative deceit on these subjects without consequence.  But, as stated previously and as evident from the video recording of the interview, Jordan does not claim that there was such deceit, threats, coercion or impropriety.  See United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991) (even when there is affirmative deceit, the Fifth Amendment is not violated unless "the defendant's will was overborne by the [challenged] conduct.").

In sum, the defendant's motion raises no factual issue requiring a hearing, and the purely legal question raised—whether the failure to tell the defendant about the murder charges at the outset of the interview is constitutionally impermissible—has been soundly answered by the Supreme Court.  The defendant's Miranda waiver was valid and his subsequent statements were voluntary and admissible.

## CONCLUSION

For the foregoing reasons, the government respectfully submits that the defendant's motions should be denied in their entirety without a hearing.

* * *

20

The government respectfully requests permission to file this memorandum under seal and file an appropriately redacted version on the public docket.  Filing the unredacted memorandum publicly—and thus revealing ▬▬▬ proffer with law enforcement—will likely harm the ability of law enforcement to secure current and future cooperation from persons similarly situated, a fact that weighs against public disclosure.  See United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995).  It also may jeopardize ▬▬▬ health and safety ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ See, e.g., United States v. Doe, 63 F.3d 121, 182 (2d Cir. 1995) (danger to persons may justify sealing).  As the facts set forth above provide support for the "specific, on the record findings" necessary to support sealing, Lugosch v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006), the government respectfully requests that the Court record those findings and file this memorandum under seal.


Dated:      Brooklyn, New York
            July 8, 2022

                                        BREON PEACE
                                        United States Attorney
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                          By:        _____/s/_____
                                        Artie McConnell
                                        Mark Misorek
                                        Assistant United States Attorneys
                                        (718) 254-7000